All right. Our next case for this morning is L.P. v. Marian Catholic High School, Ms. Grieb. Good morning and may it please the Court. My name is Mary Grieb. I represent the appellants in this case. Keeping our schools and our communities safe and drug-free has long been the province of the government. But in this case, Marian Catholic High School undertook keeping itself safe and drug-free by accepting a federal government grant to do exactly what we're challenging here. Marian Catholic High School has a mandatory drug testing program that is run with money from the federal government. The administrator, essentially, of the program is Defendant Drackert, a guidance counselor at Marian Catholic High School. The program began, from what we can tell, in 2008 with the application for a grant from the Department of Education. We've alleged enough in the complaint to have state action in this case. So I'm surprised that you're pushing on state action so much. First of all, because simply taking federal money isn't generally considered enough to make you a state actor. But secondly, it seems to me the relevance of the state money is to your Title VI case. You're a recipient of federal funds. There are various requirements, including not discriminating on the basis of race on all recipients of federal funds, just as the same thing with Title IX for sex discrimination. And as to the Title VI claim, the district court finds that there just isn't enough to show discrimination. Well, two responses to that. First, as far as federal funding not creating state action, that's absolutely true. Courts have held, this court, the Supreme Court, have held that funding itself does not create state action. However, I have not been able to... So why is this different? They're getting money for this drug program. They may get money for their science program, too, for all I know, but it's not the same. They're getting money for the... The school's getting money for the drug program to carry out the wishes that the government has to keep the school drug-free and safe, using this money to implement this testing. This case challenges the drug testing program itself, the exact reason that the federal funding is given to the school. This is not a case where... So in your view, would the disciplinary decisions be subject to constitutional due process standards? Absolutely. That's absolutely correct. For the same reason? For the same reason. Has that ever been true for private schools? I have not found a case where state action has been held to apply to private schools. However, there are cases where private entities have been found to be state actors. We know that, depending on the functions, but the distinction between private and public schools has always been pretty well established. This would be a pretty remarkable development if we were to hold that a private school under these circumstances became a state actor. It would be a remarkable development, but it would be consistent with the jurisprudence on state action, at least at the pleading stage, where there's enough... Here's where I want to... I mean, just sort of jump to the core of this. This is at the pleading stage, but first of all, your group of plaintiffs themselves include one person who's not African-American, Mr. Ratkovich, and it seems that the school was getting positive results back from Omega for a variety of students, including Mr. Ratkovich and including the six African-Americans, and so that bothers me, and the other thing that bothers me is I don't see anything in this complaint to suggest why drug tests performed by Omega would be somehow systematically biased against African-Americans, that there's nothing about hair or absorption or anything. I mean, I just don't see any science in this, and at worst, it seems to me maybe Omega isn't as careful a drug tester as the advocate system or as Quest Diagnostics or as some of the others. It does require a chain of inferences. I agree that Omega is discriminating on the basis of race. We're not bringing a disparate impact claim. And Omega doesn't know whose hair it's testing. That's correct. There's no allegation that Omega knows the race of the person whose hair it's testing. And we know that Ratkovich gets kicked out for positive results, just as well as these other people. Do we know what the racial makeup of this school is? It's not in the complaint, but it's roughly 50-50. And there's nothing in the complaint about how many negatives there are for African-American students, how many positives there are for Caucasian students. Where does one come up with disparate impact as a foundation for where you need to go with disparate treatment? We don't have that information as far as negatives and positives for African-Americans and white students. How can you say that this is having a disparate impact? We don't say this is a disparate impact. I'm sorry if I was unclear. We're bringing intentional racial discrimination claims. But I thought the theory, at least against Omega, has to be there's a disparate impact, they know about it, and they persist with that course of conduct. Did I misunderstand that? No. I think, if I can articulate it correctly, the theory is that the tests are wrong, that Omega's running. The tests affect black students. There's been communication. That there's a systematic bias, correct, in the test results. That's the claim, right? Not exactly. But I thought you told me a minute ago that you agreed that Omega has no idea whose specimens it's testing, whether it's hair or anything else. And so that makes it awfully hard for me to imagine a claim of intentional discrimination on Omega's part, which would take us to where Judge Hamilton is going. Is there even a claim that the kinds of tests Omega is using have a racially disproportionate impact? And you're saying, no, not that either. So I don't know what your theory is, vis-a-vis Omega. We'll get to the high school in a minute. The theory against Omega is that they're, and again, it does require a chain of inferences, the tests are wrong. The plaintiffs don't use cocaine. These tests are false positives. There's been communication. But why is that anything but Omega being a sloppy tester? Why does that turn into race discrimination, redressable under whatever? Under Title VI, under 1981, under anything? There's inferences to be drawn from the comments Ms. Drackert, Defendant Drackert, made to the students. But not vis-a-vis Omega. I want to just, if we're on the topic of Omega, we can talk about Omega. I also have grave reservations about the school in that I don't see anything in your complaint that the school is testing only the African-American students and not the Caucasian students. They do retest when they get a positive result, but that doesn't strike me as something that would point to racial discrimination, especially when they seem to retest if it's either Caucasian or African-American. As to the school, the racial discrimination comes to play in the way the students, the six African-American plaintiffs, have been disciplined as a result of these tests. There's an allegation in the complaint that white students were allowed to test differently. For example, using hair from other parts of their body, not their head. White students were not compelled to go to... Why would that make a difference? I mean, I'm confused. This is where I'm longing for some sort of science behind this, because I don't know why hair from your arm would test differently from hair from the top of your head. I think we can only infer that the school and the Omega have some communication about why that might be different. Why would white students be allowed to take hair from their arm or their leg and not their head? Is there any indication that hair products would lead to a false positive for a cocaine or other drug? It's mostly cocaine we're talking about here. So for a cocaine test? There is some literature about that. It's not in the complaint, but there is some literature about... What, hair straightening or relaxing products make you look as though you have cocaine in your system? Of course. There are many environmental factors that could possibly affect the results and create a false positive. Some of those specific to African-Americans, or specifically African-American hair versus non-African-American hair. If I could turn to Ms. Drackert's comments, we believe that those comments themselves... Can we back up? So what have you got on Omega? For race? I haven't heard anything yet. That it's, again, it's a series of inferences. The tests themselves are inaccurate. They're conflicted by other test results from other labs that are not Omega.  It is African-American students complaining about the testing, affirming and swearing that they do not take cocaine or use cocaine, that the tests must be wrong. There's Drackert herself making comments about the students' hair types and hairstyles, which are specifically African-American hair types and hairstyles. And that's where the link comes in. So it's a bank shot from off of Drackert. You think you've got allegations that Drackert is racially biased and somehow Omega is tainted by her bias. Is that the theory? That's generally the theory. At this point, with the information we have to put in the complaint, that there's communications we can infer from Drackert to Omega, and that adds up to a racial bias claim of intentional discrimination. The district court erred, we believe, in using Mr. Rakovich, the white plaintiff's situation, as an inference to be drawn against the African-American plaintiffs. Mr. Rakovich could have filed a separate lawsuit or could have not filed any lawsuit at all, and it would not have been proper at the pleading stage. But the point is, you're trying to show discrimination on the basis of race. And so if what you have in fact shown is equal treatment between members of different races, you haven't shown discrimination. You've pleaded yourself out of court, at least vis-a-vis Omega. And as for the school, if they're all subjected to these random school-ordered drug tests, then, I mean, maybe the school's being overzealous, but the worst that we seem to be hearing is that the tests are inaccurate. But inaccurate's not discriminatory. The tests are inaccurate. The tests, we believe, are inaccurate in a racially discriminatory way. But more importantly, with respect to the school and the claims against Ms. Drackert, the tests, the discipline resulting from the tests, is unfair, unconstitutional. Can you be more specific? What's the worst thing you've got on Drackert? The comments to two of the students that they must have drugs at home or the family must be selling drugs. We believe these prey on racial stereotypes about the families. There's no evidence that there's any sort of drug selling. There's no reason that Ms. Drackert would make these types of comments about the students, how drugs may have gotten into their system. I see that I'm into my rebuttal time. I could reserve. If you would like to save it, that's all right. Thank you. So, Mr. Copon, are you going first? Yes. All right. Good morning. Andy Copon on behalf of Mary Catholic High School, the Dominican Sisters of Springfield, and the guidance counselor, Joanna Drackert. And in response to plaintiff's arguments, Joanna Drackert, it is not alleged, said that your parents must be selling drugs at home. That is not an allegation or complaint. The only thing that's alleged against Joanna Drackert with respect to comments is that after a student tests positive, two of the students were asked if there were drugs at home. And that is just a guidance counselor's inquiry as to whether or not, how deep the problem is that they're dealing with when the person tests positive for cocaine in their system. Cocaine and its main metabolite. All of the plaintiffs tested positive for cocaine and its main metabolite. So what is being alleged here is that Mary Catholic decided nine years ago to put into place for its adolescents, its teenagers at its high school, a mandatory drug test. And all the students knew this when they came to the high school. Now, I take it this was optional. The federal funds are available if you want to do this, but Mary Catholic didn't have to do it if it didn't want to, or was it required somehow? The program itself is a decision that's made by Mary Catholic. So it was their choice. That's right. It was their decision to implement the mandatory drug testing program. And it's alleged that every single student that walks in the door at Mary Catholic is tested for drugs. And these seven plaintiffs all tested positive. And when you look at what's the greatest harm that occurred to any of these students, three of them, it is alleged, were asked to leave. The white star athlete was expelled from the school after testing positive twice for having cocaine, and it's made metabolite in his system according to the test results. The two African-American students that were asked to leave, one tested positive five times. The other tested positive four times. And that's when the district court looked at these allegations and said it's not plausible to infer intentional discrimination based on the well-plaid factual allegations contained in the First Amendment complaint. So when you refer to multiple tests, I thought one of the assertions I picked up was that the white students had more opportunities after a bad test to rehabilitate themselves. And that's where when you look at the specific allegations contained in the complaint, Your Honor, you'll see that four of the African-American students were immediately retested. Two of them specifically asked to be retested. By somebody other than Omega or by Omega? No, by the school, under its program. By the school, at the school's expense? Yeah. So there's a conclusory allegation that students who were not members of the protected class were allowed to be immediately retested. And when you look at the allegations for the specific African-American students, four of them were immediately retested, two of them at their request. And the other two, there's no allegation that they asked to be retested. So, Mr. Copon, the thing that I find most challenging for your position here is the fact, of course, that we're on a 12B6 dismissal. And we've got Paragraph 34 in the First Amendment complaint that talks about this in general, about the differential approach to students. Then we have the series of individual allegations. And I guess I'm wondering, so should the plaintiffs have just left out those individualized allegations and left stuck with the general allegation of Paragraph 34? I think, Your Honor, they were given leave to amend to see if they could state a cause of action. And I think this is where Ashcroft v. Iqbal is very important in understanding why the 12B6 should be granted instead of allowing plaintiffs to go forward and seek discovery on these issues because they do not plead a cause of action of intentional discrimination against Joanna Draggart and against the school. And we're seeking punitive damages. Well, the general allegations in Paragraph 34 about racially differential discipline of students, that's the kind of thing that will support a claim, right? Yes. And we ordinarily allow intent to be pled generally. That's clear from the rules. And so it looks to me like the plaintiffs said too much under this approach. I think they did plead themselves out before, Your Honor. But this is what Iqbal says, that you just can't plead the elements of your case. You have to plead facts. And when they plead the facts, the facts go completely contradictory to the elements of their case because they essentially plead three things. One, that students who were not members of protected class were allowed to immediately retest. As I said, that's not true when you look at the specific allegations. Second, they say that you're allowed to take hair from other parts of the body. They don't say that that's discriminatory, but they say that occurs. One of the plaintiffs alleges that hair was taken from his leg nine times, an African-American student. It says that in the complaint. And the third is that the discipline was different. And the factual allegations show that that's not true, that the discipline was the same. So what about the drug counseling? There's an allegation that the African-Americans are immediately directed to drug counseling and the Caucasians are not? Yeah, and that's not true either. On the drug counseling, three of the African-American students do not allege that they took drug counseling. JBCC make no allegations of having to go through drug counseling. IJ said she was told she had to go through counseling. She doesn't plead that she did. So the four students that went through drug counseling, one tested positive four times, one tested positive five times, and the other one was the white star football player who alleges that he had to go through drug counseling. So the drug counseling program is part of the program. That's a non-discriminatory program. Everybody has to go through it. And the evidence, the factual allegations show that not all of the African-American students even went through the drug counseling program. So that's why I think it's important to look at the factual allegations to say, should they be allowed to go forward? And when the district court said there's no plausible inference of discrimination, that's the key here. The mere possibility does not entitle these plaintiffs to go forward to conduct discovery on these serious allegations that they're making in a conclusive fashion when you look at the well-planned factual allegations contained in the complaint. If there's any other questions. I think not, so thank you. Thank you, Your Honor. Ms. Caldwell, I presume you represent Omega. I do, Your Honor. Currently, there's only a 1981 claim pending against Omega. It's a drug testing laboratory where Sunkist Tested had no contact with any of the appellants, did not know their race at the time they tested it. They reported them, according to the factual allegations, they reported them negative at times. So Omega does this nationwide? It does. Tell me something about Omega. Omega is one of the three major drug testing laboratories in the country. They offer a variety of cutoffs, so the school chose one that was relatively low because they had a zero tolerance policy, which is different from some of the other programs. For example, when plaintiffs went and got their test, they are ISO certified. They're certified by the College of American Pathology. Ms. Caldwell, are you familiar with the city of Boston litigation going on? I am, Your Honor. Where police officers in Jones against Boston have pursued this theory of disparate impact in the hair testing. Yes, I am, Your Honor. And that's, if I recall correctly, summary judgment was reversed a few weeks ago, right? It was. So we haven't had any discovery, any development of the science here. We've got our colleagues in the First Circuit looking at a record and saying there's at least a genuine issue of fact, I think, about statistically significant differences in reliability in tests of Caucasian versus African-American hair samples. So that suggests there's at least some room for scientific debate, and I'd welcome your comments on that and your thoughts about whether the existence of that debate might have an impact here. Well, interestingly enough, in the first amendment complaint, I believe you're referring to the argument about color bias, the idea that melanin in hair with dark hair colored people absorbs more drug. There is no inference that it causes cocaine to appear. And, in fact, the Boston case is really over police officers who handle drugs on a regular basis. So it's a very different sort of argument. There is no dispute, and they had a much higher cutoff, and actually the scientific studies show that to the extent there is a bias as far as concentration levels, that would, in fact, be only at higher concentration levels. At the 100 cutoff, all the studies have said there is no bias whatsoever. But it's not that cocaine magically appears from dark colored hair, but rather the level and whether you go over or under cutoff is the science. There is a debate over the studies. There's also a debate over a lot of it, and epidemiological studies don't show it. But that is going on at that level and a remand for science. It would not be a Section 1981 claim. That is not an intentional conduct. And, of course, we're not here about negligence or whether and most of the Boston Police Department is really over what discipline should be imposed, how should it be interpreted rather than the scientific, what is the concentration of it in an individual hair. It's rather how that should be used by other people is what the Boston Police Department action is going over for those public employees. Thank you. Okay. Right here we're on Section 1981. There is no allegation of intentional conduct. The best they have is they knew or should have known. There is also undisputed that they've pled themselves out. They said that Omega tested them negative. They said they tested them positive. We also obviously have the idea that a Caucasian person. So there's no racial inference, and any inferences that have been brought forward in this appeal, which are not in the First Amendment complaint and were not brought for the district court, really, frankly, don't go to Omega. There are none. There are none. They were given the opportunity to replead, and they have not done so. It's very clear that a Section 1981 claim requires intentional conduct. Disparate impact will not suffice, and that's the only other claim. I can go into this, but I think you all probably know this even far better than I do, and I'm happy to answer any questions, but that's really our point. For a moment, again, we'd ask for the district court to be affirmed. All right. I don't see any other questions. Thank you very much. Ms. Green, you can have the last word. Thank you, Your Honor. A few very brief points on rebuttal. A couple of factual corrections I wanted to make. There's no allegation in the complaint that any African-American plaintiff had hair tested from his leg. That's inaccurate. And then as far as the comment from Ms. Drackert to J.B., it's paragraph 48 of the amended complaint. It's whether or not J.B.'s parents used or sold drugs out of the home, and that's a direct line from the complaint itself. Four students went through drug counseling, as counsel pointed out, in 2014 and 2015. It seems it's a fair inference that when more students started to complain about the program, and when the lawsuit itself was filed, that's when this mandate for drug counseling stopped. We think that that shows some sort of circumstantial knowledge that there's a problem with the program and there's a problem with the way it's being implemented. And then finally, Judge Hamilton, to your point, the Boston litigation is exactly why we need discovery in this case. There may very well be problems, and we believe there are, with racial bias and drug testing. Well, but how do you link a debate about whether there is a disparate impact? How do you go from there to intentionally racially discriminatory action? Well, if Omega knows that there is a disparate impact and Omega continues to use these tests anyway, even in the face of African-American students complaining that the tests are not accurate, saying that they don't use cocaine and providing contradictory test results, then that's enough of a circumstantial leap to support our 1981 claim against Omega. Are there any other questions? Thank you. Thank you very much. Thanks to all counsel. We will take the case under advisement.